ELECTRONICALLY FILED
10/24/2023 1:15 PM
05-CV-2023-901336.00
CIRCUIT COURT OF
BALDWIN COUNTY, ALABAMA
BRENDA Q. GANEY, CLERK

## IN THE CIRCUIT COURT OF BALDWIN COUNTY, ALABAMA

DAVID A. MCDONALD,      *

     Plaintiff,      *

v.      *      **CASE NUMBER CV-2023-____**

DARRELL WAYNE GRIMSLEY, JR.;      *
LIBERTY RENT, LLC; DATA
HOLDINGS, INC., **FICTITIOUS**      *
**PARTIES A, B, C, D, & E,** whether
singular or plural, are those persons,      *
corporations, or entities whose
negligence, wantonness,      *
fraud or other wrongful conduct caused      **JURY DEMAND**
or contributed to cause the      *
occurrence made the basis of this
lawsuit and who are otherwise      *
unknown to plaintiff at this time but
whose true and correct names will      *
we substituted by amendment when
ascertained,      *

     Defendant.      *

## <u>COMPLAINT</u>

### PARTIES, JURISDICTION AND VENUE

COMES NOW the Plaintiff, DAVID A. MCDONALD, and files this Complaint against DARRELL WAYNE GRIMSLEY, JR., LIBERTY RENT, LLC, DATA HOLDINGS, INC. and as grounds therefor shows as follows:

1.     Plaintiff DAVID A. MCDONALD (McDonald) is, and at all times relevant to this complaint, has been a resident of Baldwin County, Alabama.

2.     Defendant DARRELL WAYNE GRIMSLEY, JR., (Grimsley) is, and at all times relevant to this complaint, has been a resident of Baldwin County, Alabama.

3.     Defendant LIBERTY RENT, LLC is a North Carolina Company with its principal place of business in Baldwin County, Alabama.

4.     Defendant DATA HOLDINGS, INC. is a North Carolina Company with its principal place of business in Baldwin County, Alabama.

5.     At all times Grimsley was acting on behalf of Liberty Rent, LLC and Data Holdings, Inc. and their predecessors in interest.

6.     This Court has jurisdiction over this action as the minimum amount in controversy is present.  Venue is proper in this Court pursuant to Ala. Code §6-3-5 (1975) and Alabama Rules of Civil Procedure 82(a).

## STATEMENT OF FACTS

### INTRODUCTION OF THE PARTIES

7.     McDonald is a practicing attorney and has been a member in good standing of the Alabama Bar for over 30 years.

8.     Grimsley was, at one time, licensed to practice law in Alabama, but is no longer authorized to do so.  Upon information and belief, Grimsley surrendered his license to practice law several years ago.

9.     Liberty Rent, LLC was formed by Grimsley sometime in 2021 as a successor to an Alabama Corporation Liberty Rent Guarantee, LLC.

10.    Data Holdings, Inc. was formed by Grimsley in 2021 to own Liberty Rent, LLC in order to accommodate investments by Benson Capital Fund I, LP.

### FORMATION OF LIBERTY RENT GUARANTEE, LLC

11.    In 2014, Grimsley, with the financial backing of others, formed Liberty Rent Guarantee, LLC. (LRG).

12.    LRG was an Alabama company with its principal place of business in Fairhope, Alabama.

13.    LRG assisted tenants in qualifying to rent an apartment of their choosing by guaranteeing (for a fee), the tenant's rent.

14.    Specifically, if a prospective tenant applied to rent an apartment but the property owner (or the owner's managing agent) rejected the tenant's application because the prospective tenant had deficiencies in his credit or employment history, LRG (provided the tenant passed LRG's credit screening criteria which was less onerous than the property's credit criteria) would offer to guarantee up to six months of the tenant's rent.

15.    If the property owner (or its managing agent) accepted LRG's guarantee, the tenant would be able to move into the property that had previously rejected them as a credit risk.

16.    In exchange for guaranteeing the tenant's rent, LRG charged the tenant the equivalent of one month's rent.

17.    For years, Grimsley promoted LRG to McDonald as a company that was "doing well by doing good."  Meaning, LRG was operating profitably by performing a societal good - helping families qualify to live in apartments that they had been rejected from because of their poor (or non-existent) credit history.

## FORMATION OF LIBERTY RENT INSURANCE, INC

18.    On November 21, 2019, Grimsley obtained from the Alabama Department of Insurance a "Certificate of General Good" pursuant to Ala. Code §27-31B-8 to form

and operate a protected cell, captive insurance company known as Liberty Rent Insurance, Inc.

19.    Grimsley represented to McDonald that LRG's authorization by the Alabama Department of Insurance to form a captive insurance company was a "game changer" for LRG because it would enable Grimsley to market and grow LRG exponentially.

## GRIMSLEY'S INITIAL OVERTURES TO MCDONALD

20.    Over the years, McDonald had provided Grimsley with legal consultation and overall guidance regarding various issues (unrelated to regulatory issues) that arose regarding the operation and management of LRG.

21.    McDonald never charged Grimsley or LRG for this legal consultation or guidance because he was happy to contribute to a company that was on the path to "doing well by doing good."

22.    In 2020, Grimsley began making increasingly persistent overtures to McDonald for McDonald to leave his thriving law practice and help Grimsley operate and grow LRG.

23.    Grimsley's sales pitch was that after years of screening potential tenants and refining its credit criteria, LRG was beginning to reach a point where it could quickly review and approve an application with minimal risk of tenant default.

24.    Grimsley bragged to McDonald that he had invested hundreds of thousands of dollars in developing a computer program that would improve and expedite LRG's underwriting process.

25.    According to Grimsley, LRG (and its captive insurance company) now needed a "leader" to guide the company and expand the number of apartments that accepted LRG's guarantees.

26.    Throughout 2020, Grimsley would consult with McDonald, seek McDonald's advice and guidance on various matters, and implore McDonald to leave his law practice, become part owner of LRG, and invest his time and energy into growing LRG.

27.    McDonald always declined Grimsley's overtures because McDonald operated a small but successful law practice that relied upon referrals from practicing attorneys.  It took McDonald decades to grow his practice and to cultivate referral of the type of complex cases that McDonald specialized in.

28.    However, by the end of 2020, McDonald was becoming increasingly receptive to Grimsley's proposal that McDonald become part owner of LRG.

**FORMATION OF LIBERTY RENT, LLC AND MRG**

29.    Based on the advice of a new captive insurance manager, in September 2020, Grimsley formed a new company: Liberty Rent, LLC (Liberty Rent) and a new captive insurance company Multifamily Risk Group, Inc. (MRG) in North Carolina.

30.    Grimsley transferred the business and assets of the Alabama corporations LRG and Liberty Rent Insurance, Inc. to the North Carolina companies Liberty Rent and MRG.

31.    Except for the name change and state of incorporation, Grimsley otherwise continued his business operations as usual.[1]

_____

[1] In 2021, Grimsley dissolved LRG and Liberty Rent Insurance, Inc.

32.     Although Liberty Rent and MRG are North Carolina companies, their principal place of business remains in Fairhope, Alabama.

## BENSON'S $3 MILLION INVESTMENT

33.     Throughout 2020 and 2021, Grimsley was searching for investors to provide him capital necessary to expand Liberty Rent.  In 2021, Grimsley announced that he had retained Founders Advisors Technology Practice a company out of Birmingham, Alabama to help him woo potential investors.

34.     Often after meeting with a potential investor, Grimsley would consult with McDonald, update McDonald on Grimsley's progress in attracting investors, and seek McDonald's guidance regarding moving forward.

35.     Every such meeting between McDonald and Grimsley would include a discussion about what the transition from McDonald's law practice to overseeing Liberty Rent/MRG's operations would look like.

36.     By the end of 2020, McDonald, in reliance upon Grimsley's promises of an ownership interest in Liberty Rent/MRG in exchange for McDonald's leadership, stopped accepting new clients or otherwise promoting his thriving law practice.

37.     Grimsley (acting on behalf of all defendants) discussed and understood that McDonald's reliance upon Grimsley's promises of ownership would cause McDonald to give up a significant income from his law practice and that if McDonald for any reason had to return to his law practice, the loss of momentum during the interim would cost McDonald significantly.

38.    

39.    Benson is a private investment fund operated by Benson Capital Partners, LLC, a company founded by Gayle Benson (owner of the New Orleans Saints and New Orleans Pelicans).

40.    According to press releases, Gayle Benson formed Benson to "facilitate and jump-start new business formation, workforce expansion and wealth creation in New Orleans and across the Gulf South."

41.    Redacted

## GRIMSLEY'S VALUATION OF LIBERTY RENT AND MRG

42.    Grimsley often told McDonald that he had structured Liberty Rent and MRG as a FinTech operation (meaning the companies are essentially financial service type companies).    According to Grimsley, he and his outside advisors (including Founders Advisors Technology Practice) valued the companies at about $70 million.

43.    According to Grimsley, at their predicted rate of growth, Liberty Rent and MRG would be worth several multiples of $70 million by 2025.

44.    Grimsley represented to McDonald that although Benson's valuation of Liberty Rent and MRG was "low," he agreed to the valuation because the Redacted buy-in would immediately provide Liberty Rent and MRG with capital needed to grow, *and* Grimsley would retain control of the companies.

45.    Grimsley relayed that his plan was to use the funds provided by Benson (and any funds from the potential second funding) to grow the operation, expand the products being offered by Liberty Rent, and by 2025, either sell the company or take it public.

### FORMATION OF DATA HOLDINGS, INC

46.    As part of his agreement with Benson, Grimsley agreed to form a new North Carolina company, Data Holdings, Inc. (Data Holdings), and to transfer his ownership in Liberty Rent and MRG to Data Holdings.

47.    Redacted

48.    While Grimsley represented to McDonald he had an agreement with Benson by late summer 2021, he was far from actually finalizing that agreement with Benson.

49.    Grimsley requested that McDonald become involved with the Benson transaction.

50.    When McDonald advised Grimsley that Grimsley needed to rely upon the outside counsel that Grimsley had already retained to handle the Benson transaction, Grimsley responded by stating that he would rely on his other counsel to draft the documents and provide legal advice about the transaction, but he wanted McDonald to commit to transitioning into full-time engagement with the business and that McDonald's

participation in the Benson Capital closing would signify McDonald's commitment to the companies.

## THE DEFENDANTS' OFFER TO MCDONALD

51.   Up until Grimsley announced the Benson investment, the parties' agreement was general: McDonald had already agreed to become more involved in the day-to-day operations of the companies in exchange for a significant, (but as yet unspecified) percentage ownership in the companies.

52.   The parties discussed McDonald's ownership in the companies in terms of a percentage of Grimsley's ownership.   Discussions as to what McDonald's exact ownership interest would be ranged between 30-50% of Grimsley's ownership.

53.   Grimsley and McDonald also discussed that McDonald's day-to-day involvement in the operation of the companies would phase-in over time as McDonald wound up his caseload and his obligations to his existing clients.

54.   Several months after McDonald had committed to winding down his law practice and began participating in the day-to-day operations of the companies, the parties continued to discuss and refine what McDonald's compensation would be for the commitment McDonald had already made to the companies.

55.   By about the time McDonald became more involved in the Benson transaction, the parties had agreed that the companies would pay McDonald the same benefits and salary that Grimsley was drawing and that McDonald would be assigned 30% of Grimsley's ownership in Data Holdings.

56.   The parties specifically discussed that even at Benson's "low" valuation, 30% of Grimsley's share in the companies would place a present value of McDonald's

share at about $11 million -- with the potential to increase that amount exponentially by expanding the customer base and/or products.

## GRIMSLEY'S FALSE REPRESENTATIONS

57.     Throughout these discussions, whenever McDonald expressed hesitation over being asked to lead a company operating in a field (rent guarantee and insurance) in which McDonald had no experience, Grimsley, a former lawyer, repeatedly assured McDonald that:

a.      Grimsley had been involved in the industry for over a decade;

b.      Grimsley had studied the laws in all states in which the companies were operating;

c.      The companies complied with all applicable laws and regulatory requirements;

d.      Grimsley had operated the companies under the guidance of outside legal counsel and/or insurance experts who were experienced and knowledgeable about insurance regulations;

e.      Grimsley was able to operate his companies profitably when other similar companies had failed because he had spent years refining underwriting guidelines, investing in computer software and programs, training his employees, and staffing his underwriting department with experienced personnel who were able to quickly process applications;

      f.    All that Liberty Rent lacked was a qualified leader to replace Grimsley who could bring the management team together and expand the customer base and (possibly) products offered; and

      g.    If McDonald agreed to wind down his law practice the defendants would compensate McDonald with a salary and benefit package equal to Grimsley's and, more importantly, an ownership interest in what became Data Holdings that was equal to 30% of Grimsley's ownership of the company.

58.    These assurances (except the assurances about Grimsley's involvement in the industry for over a decade) were patently false.

## MCDONALD'S DETRIMENTAL RELIANCE

59.    In reliance upon the defendants' patently false representations and the promised compensation, McDonald:

      a.    Stopped seeking referrals from other lawyers and accepting new clients;

      b.    Assisted Grimsley in communicating with Benson and in reviewing closing documents related to the Benson funding;

      c.    Agreed to accept a leadership position at Liberty Rent/MRG;

      d.    Became involved in Liberty Rent's day-to-day management;

      e.    Traveled to meet potential customers;

      f.    Began researching and developing new products for Liberty Rent to offer customers; and

      g.    Addressed and resolved Liberty Rent's non-regulatory legal issues.

60.    Eventually, McDonald was named Director and General Counsel for Liberty Rent.

61.    By late 2021 and early 2022, as McDonald began independently familiarizing himself with all aspects of Liberty Rent and MRG, McDonald became increasingly concerned that the representations Grimsley had made about the condition of Liberty Rent/MRG were not true.

62.



63.

64.

65.    When McDonald raised his concerns with Grimsley, however, Grimsley reassured McDonald that Grimsley had, for several years, employed teams of lawyers to properly structure Liberty Rent/MRG, to set up the underwriting department, to properly register the companies to do business in each state, and to comply with any applicable insurance regulations.

66.    Grimsley would then explain to McDonald that McDonald's concerns were the product of McDonald not yet understanding the nuances of the underwriting department or MRG's operations as a captive insurance company.

67.    Grimsley would then reassure McDonald that McDonald was not responsible for underwriting or regulatory compliance and would redirect McDonald's attention to other aspects of the business such as supervising the management team, marketing the company to potential new properties, and developing new products (such as security deposit elimination and criminal background checks).

68.    While McDonald followed Grimsley's directions and focused on other aspects of the company, he remained troubled by Grimsley's failure to provide straight answers to direct questions.

## LIBERTY RENT/MRG REGULATORY COMPLIANCE



69.    Redacted

70.    Redacted

71.    Redacted

72.    Moreover, many of the states in which Liberty Rent/MRG operated prohibited the sale of insurance through "captive" insurance companies such as MRG. So, even if Liberty Rent/MRG could otherwise qualify, regardless of all other deficiencies in Liberty Rent/MRG's organizations and operations, Liberty Rent/MRG

could not operate as they were in states (such as Texas) that prohibited the operations of captive insurance companies.

73.    Redacted

74.    However, none of the properties with whom Liberty Rent was doing business held an ownership interest in MRG.

75.    Yet, the very definition of a captive insurance company (which is formed and operated to avoid the onerous mandatory minimum reserves and other regulatory restrictions imposed on insurance companies) is a company that *only* transacts business with an affiliate company – a company that has an ownership interest in the captive.

76.    Redacted

77.    Redacted

78.     

79.

80.     Grimsley further admitted that he was fully aware of this unresolved regulatory issue *before* he induced McDonald to leave his law practice and agree to lead Liberty Rent.

81.     With this confession, Grimsley admitted that the core of what he had told McDonald in order to induce McDonald into a partnership with Grimsley was false.

82.     Rather than immediately suing Grimsley for fraud, however, McDonald felt a sense of responsibility to Liberty Rent, its employees, and customers.  So, McDonald focused his energy on bringing the companies into regulatory compliance.

83.     Unknown to McDonald at the time, Grimsley never intended to bring Liberty Rent/MRG into regulatory compliance.

84.     Grimsley only pretended to be on board with bringing Liberty Rent/MRG into regulatory compliance until he could calculate a way out of his relationship with McDonald.

85.     To that end, Grimsley declared that rather than hiring a licensed insurance agent, McDonald needed to obtain the requisite license from the Alabama Department of Insurance.

86.    To obtain a property and casualty insurance license in Alabama, one must complete at least 40 hours of classroom instruction, pass numerous tests, and then sit for the state examination.

87.    After passing the examination an applicant must go through the process of applying to become a licensed agent.

88.    In retrospect, it appears that Grimsley ordered McDonald to become an insurance agent under the false hope that this would delay the issue for months, if not a year.

89.    Instead, McDonald attended the requisite classes, sat for exams, and passed the state examination in less than two weeks.

90.    However, the day after McDonald passed his Alabama Insurance license exam, ████████████████████Redacted████████████████████ ████████████████████████████████, Grimsley orchestrated a conflict with McDonald, and shortly thereafter, fired him.

91.    Upon information and belief, once he terminated McDonald's employment, Grimsley made no effort to bring Liberty Rent/MRG into regulatory compliance, to alert Benson to the fact that such regulatory issues existed, or to compensate McDonald as agreed upon.

## COUNT I
## BREACH OF CONTRACT

92.    Plaintiff realleges and incorporates herein all preceding allegations:

93.    The parties mutually agreed that if the plaintiff agreed to accept the defendants' offer of employment, the defendants would compensate the plaintiff by paying to the plaintiff:

(a)    A salary equal to Grimsley's salary (including all options, bonuses, and benefits whatever the form); and

(b)    30% of the shares Grimsley owned in Data Holdings.

94.    The defendants breached this agreement by not paying to the plaintiff a salary (including all options, bonuses, and benefits) equal to Grimsley, and by not executing transfer of 30% (or any) of the shares owned by Grimsley in Data Holdings.

WHEREFORE, the premises considered, plaintiff demands judgment against the defendants for compensatory damages as a result of this breach of contract.


**COUNT II**
**FRAUD IN THE INDUCEMENT**

95.    Plaintiff realleges and incorporates herein all preceding allegations:

96.    During discussions regarding McDonald's contemplated ownership of Data Holdings, Grimsley, acting on behalf of all defendants, had a duty to speak the truth.

97.    To induce plaintiff to wind down his law practice and to agree to become employed by, affiliated with, and part owner of the defendants, Grimsley, acting on behalf of all defendants, made numerous false representations regarding material existing facts that were made intentionally, recklessly, or innocently, including:

a.    Liberty Rent/MRG (as of late summer/early fall of 2021) were worth at least $70 million;

b.    Liberty Rent/MRG would be worth several multiples of $70 million by 2025;

c.     Liberty Rent and MRG were legally operating throughout the entire country including, but not limited to, in Texas, Louisiana, Florida, Alabama, Georgia, North Carolina, and South Carolina;

d.     Because MRG was Liberty Rent's captive insurer, Liberty Rent was able to legally sell its product throughout the country – even in states that considered Liberty Rent's product to be a form of insurance;

e.     Liberty Rent and MRG were registered with the S*ecretary of State* or otherwise had certificates of authority to do business in every state in which they operated;

f.     Over the years, Grimsley had followed the guidance of lawyers and insurance specialists and in reliance upon, and in compliance with that professional and legal advice, Liberty Rent and MRG were properly and legally operating throughout the country;

g.     Grimsley had spent years refining and perfecting the operations of Liberty Rent and MRG (including the underwriting, marketing, and claims departments) so that all the plaintiff needed to focus on was helping the defendants' market and grow their existing business and assist the defendants in developing and marketing new products (such as safety deposit elimination and tenant background checks);

     h.     The defendants had invested hundreds of thousands of dollars in developing a sophisticated computer program that helped the underwriting department sort qualified applicants;

     i.     The only thing missing from Liberty Rent/MRG was a competent, trustworthy leader to replace Grimsley in overseeing day-to-day operations so that Grimsley could focus on being a "visionary;"

     j.     Grimsley had a plan to either sell to a larger company or take the company public in two to three years; and

     k.     The defendants would ensure that plaintiff would be paid the same salary as Grimsley (including all options, bonuses, and benefits whatever the form) and 30% of the shares Grimsley owned in Data Holdings.

98.    The plaintiff relied to his detriment upon these false representations by agreeing to wind down his practice and accept employment with, affiliation with, and an ownership interest in the defendants.

99.    As a direct and proximate result of the defendants' tortious conduct, plaintiff lost millions of dollars in lost income from his practice, lost tens of millions of dollars he would have earned had Grimsley, acting on behalf of all defendants, not completely misrepresented Liberty Rent/MRG's operations, and has suffered additional damages.

100.    Given the tenuous legal status of Liberty Rent/MRG's operations, it is likely that McDonald's damages in the form of lost income from his law practice will

significantly eclipse any income he would have earned as a result of owning 30% of Grimsley's share in Data Holdings.

WHEREFORE, the premises considered, plaintiff demands judgement against the defendant for compensatory and punitive damages in an amount to be determined by the jury.

## COUNT III
## NEGLIGENCE/WANTONNESS

101.    Plaintiff realleges and incorporates herein all preceding allegations:

102.    During discussions regarding McDonald's contemplated ownership of Data Holdings, Grimsley, acting on behalf of all defendants, made numerous false representations regarding material existing facts that were made negligently, innocently, or wantonly, including:

      a.    Liberty Rent/MRG (as of late summer/early fall of 2021) were worth at least $70 million;

      b.    Liberty Rent/MRG would be worth several multiples of $70 million by 2025;

      c.    Liberty Rent and MRG were legally operating throughout the entire country including, but not limited to, in Texas, Louisiana, Florida, Alabama, Georgia, North Carolina, and South Carolina;

      d.    Because MRG was Liberty Rent's captive insurer, Liberty Rent was able to legally sell its product throughout the country – even in states that considered Libert Rent's product to be a form of insurance;

e.    Because MRG was Liberty Rent's captive insurer, Liberty Rent was able to legally sell its product throughout the country – even in states that considered Libert Rent's product to be a form of insurance;

f.    Liberty Rent and MRG were registered with the S*ecretary of State* or otherwise had certificates of authority to do business in every state in which they operated;

g.    Over the years, Grimsley had followed the guidance of lawyers and insurance specialists and in reliance upon, and in compliance with that professional and legal advice, Liberty Rent and MRG were properly and legally operating throughout the country;

h.    Grimsley had spent years refining and perfecting the operations of Liberty Rent and MRG (including the underwriting, marketing, and claims departments) so that all the plaintiff needed to focus on was helping the defendants' market and grow their existing business and assist the defendants in developing and marketing new products (such as safety deposit elimination and tenant background checks);

i.    The defendants had invested hundreds of thousands of dollars in developing a sophisticated computer program that helped the underwriting department sort qualified applicants;

j.     The only thing missing from Liberty Rent/MRG was a competent, trustworthy leader to replace Grimsley in overseeing day-to-day operations so that Grimsley could focus on being a "visionary;"

k.     Grimsley had a plan to either sell to a larger company or take the company public in two to three years; and

l.     The defendants would ensure that plaintiff would be paid the same salary as Grimsley (including all options, bonuses, and benefits whatever the form) and 30% of the shares Grimsley owned in Data Holdings.

103.    The plaintiff relied to his detriment upon these false representations by agreeing to wind down his practice and accept employment with the defendant's company,

104.    As a direct and proximate result of the defendant's tortious conduct, plaintiff lost millions of dollars in lost income from his practice, and has suffered additional damages.  Given the tenuous legal status of Liberty Rent/MRG's operations, it is likely that McDonald's damages in the form of lost income from his law practice significantly eclipse any income he would have earned as a result of owning 30% of Grimsley's share in Data Holdings.

## COUNT IV

## FRAUD

105.    Plaintiff realleges and incorporates herein all preceding allegations:

106.    During discussions regarding McDonald's contemplated ownership of Data Holdings, Grimsley, acting on behalf of all defendants, made numerous false representations regarding material existing facts that were made intentionally, or recklessly, including:

a.    Liberty Rent/MRG (as of late summer/early fall of 2021) were worth at least $70 million;

b.    Liberty Rent/MRG would be worth several multiples of $70 million by 2025;

c.    Liberty Rent and MRG were legally operating throughout the entire country including, but not limited to, in Texas, Louisiana, Florida, Alabama, Georgia, North Carolina, and South Carolina;

d.    Because MRG was Liberty Rent's captive insurer, Liberty Rent was able to legally sell its product throughout the country – even in states that considered Libert Rent's product to be a form of insurance;

e.    Because MRG was Liberty Rent's captive insurer, Liberty Rent was able to legally sell its product throughout the country – even in states that considered Libert Rent's product to be a form of insurance;

f.    Liberty Rent and MRG were registered with the S*ecretary of State* or otherwise had certificates of authority to do business in every state in which they operated;

g.    Over the years, Grimsley had followed the guidance of lawyers and insurance specialists and in reliance upon, and in compliance with that professional and legal advice, Liberty Rent and MRG were properly and legally operating throughout the country;

h.    Grimsley had spent years refining and perfecting the operations of Liberty Rent and MRG (including the underwriting, marketing, and claims departments) so that all the plaintiff needed to focus on was helping the defendants' market and grow their existing business and assist the defendants in developing and marketing new products (such as safety deposit elimination and tenant background checks);

i.    The defendants had invested hundreds of thousands of dollars in developing a sophisticated computer program that helped the underwriting department sort qualified applicants;

j.    The only thing missing from Liberty Rent/MRG was a competent, trustworthy leader to replace Grimsley in overseeing day-to-day operations so that Grimsley could focus on being a "visionary;"

k.    Grimsley had a plan to either sell to a larger company or take the company public in two to three years; and

l.    The defendants would ensure that plaintiff would be paid the same salary as Grimsley (including all options, bonuses, and benefits whatever the form) and 30% of the shares Grimsley owned in Data Holdings.

107.   The plaintiff relied to his detriment upon these false representations by agreeing to wind down his practice and accept employment with the defendant's company,

108.   As a direct and proximate result of the defendant's tortious conduct, plaintiff lost millions of dollars in lost income from his practice, and has suffered additional damages.  Given the tenuous legal status of Liberty Rent/MRG's operations, it is likely that McDonald's damages in the form of lost income from his law practice significantly eclipse any income he would have earned as a result of owning 30% of Grimsley's share in Data Holdings.

Respectfully submitted,

/s/James B. Pittman, Jr.
JAMES B. PITTMAN, JR. (PIT026)
**JAMES B. PITTMAN, JR., P.C.**
P.O. Box 2525
Daphne, AL 36526
Telephone:    (251)626-7704
Facsimile:      (251)626-8202
james@jbplaw.com
**ATTORNEY FOR PLAINTIFF**

**OF COUNSEL**

/s/ David A. McDonald
David A. McDonald (MCD042)
**DAVID A. MCDONALD,**
**ATTORNEY AT LAW**
P.O. Box 832
Mobile, AL 36601
Telephone:    (251) 434-0045
Facsimile:      (251) 434-0047
dam@dmcdlaw.com

**\*\*\*PLAINTIFF DEMANDS TRIAL BY JURY\*\*\***

**TO THE CLERK:**

Please serve the defendant by Special Process Server at the following address:

Darrell Wayne Grimsley, Jr.
9583 Soldier Creek Road
Lillian, AL 36549


Please serve the defendant by Certified Mail at the following address:

Liberty Rent, LLC
18348 Greeno Road
Fairhope, AL 36532


Please serve the defendant by Certified Mail at the following address:

Data Holdings, Inc.
18348 Greeno Road
Fairhope, AL 36532