**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DAVID A. McDONALD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIV. ACT. NO. 1:23-cv-464-TFM-N** |
| | ) | |
| **DARRELL WAYNE GRIMSLEY, JR.,** | ) | |
| ***et al.***, | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the *Motion to Remand* (Doc. 18, filed December 28, 2023). Plaintiff David McDonald motions the Court remand this matter to the Circuit Court of Baldwin County, Alabama because there is not complete diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1).   *Id.*   Having considered the motion, response, reply, and relevant law, the Court finds the motion to remand is due to be **DENIED**.

## I.      BACKGROUND

Plaintiff David McDonald ("Plaintiff" or "McDonald") commenced this action on October 24, 2023, by filing a civil complaint with the Circuit Court of Baldwin County, Alabama.   *See* Doc. 3.   The complaint alleged claims for breach of contract, fraud, negligence, and wantonness arising out of Plaintiff's prior employment and business relationship with Defendants Darrell Wayne Grimsley, Jr. ("Grimsley"), Liberty Rent, LLC ("Liberty Rent"), and Data Holdings, Inc. ("Data Holdings") (collectively, "Defendants").   Defendants removed the case to this Court under 28 U.S.C. § 1441(a) on December 8, 2023, alleging diversity of citizenship under 28 U.S.C. § 1332(a) as the sole ground for subject-matter jurisdiction.[1]   *See* Doc. 1.   On December 20,

---

[1] "A defendant or defendants desiring to remove any civil action from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal . . .containing a short and plain statement of the grounds for removal

2023, Defendants amended their notice of removal in response to the Court's Order that directed them to sufficiently allege the citizenships of the natural-person parties.   Docs. 8, 14.[2] McDonald moved to remand the case to state court on December 28, 2023.   *See* Doc. 18; 28 U.S.C. § 1447(c) ("A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a).   If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

On December 28, 2023, McDonald filed his instant motion to remand.   Doc. 18. Defendants filed their response and Plaintiff his response.   Docs. 24, 29.   The Court finds oral argument unnecessary to resolve the issues that are raised in the motion to dismiss, and therefore, the motion is ripe for adjudication.

## II.   <u>STANDARD OF REVIEW</u>

Where, as here, a case is removed from state court, "[t]he burden of establishing subject matter jurisdiction falls on the party invoking removal."   *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 411–12 (11th Cir. 1999); *accord, e.g.*, *City of Vestavia Hills v. Gen. Fid. Ins. Co.*, 676 F.3d 1310, 1313 (11th Cir. 2012) ("The removing party bears the burden of proof regarding the existence of federal subject matter jurisdiction.").   "Because removal jurisdiction raises significant federalism concerns, federal courts are directed to construe removal statutes strictly. Indeed, all doubts about jurisdiction should be resolved in favor of remand to state court." *Univ. of S. Ala.*, 168 F.3d at 411 (citation omitted); *accord, e.g.*, *Scimone v. Carnival Corp.*, 720 F.3d 876, 882 (11th Cir. 2013) ("[W]hen we evaluate whether the particular factual circumstances of a case give rise to removal jurisdiction, we strictly construe the right to remove and apply a general

---

. . . ."   28 U.S.C. § 1446(a).

[2]  Because the amended notice of removal reproduces the entire original notice as amended, the undersigned will hereinafter refer only to the amended notice for pertinent allegations.   Doc. 14.

presumption against the exercise of federal jurisdiction, such that all uncertainties as to removal jurisdiction are to be resolved in favor of remand." (citation and internal quotation marks omitted)).

"A defendant may remove an action to a district court that would have original jurisdiction if complete diversity between the parties exists and the amount in controversy exceeds $75,000." *City of Vestavia Hills*, 676 F.3d at 1313 (citing 28 U.S.C. § 1332). "Diversity jurisdiction requires complete diversity; every plaintiff must be diverse from every defendant." *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998). "A party removing a case to federal court based on diversity of citizenship bears the burden of establishing the citizenship of the parties." *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004); *accord Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010) ("The burden of persuasion for establishing diversity jurisdiction, of course, remains on the party asserting it."). When the removing party's factual allegations supporting jurisdiction are challenged, that party "bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction." *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002); *accord, e.g.*, *Hertz Corp.*, 559 U.S. at 96–97 ("When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof."); *Ray v. Bird & Son & Asset Realization Co.*, 519 F.2d 1081, 1082 (5th Cir. 1975) ("The burden of pleading diversity of citizenship is upon the party invoking federal jurisdiction, and if jurisdiction is properly challenged, that party also bears the burden of proof." (citing *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974)).[3]

> A preponderance of the evidence is evidence which is more convincing than the evidence offered in opposition to it. It simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence. Or phrased in a slightly different fashion, it is proof that persuades the trier of fact that a proposition is more likely true than not true.

---

[3] The Eleventh Circuit has adopted as binding precedent the decisions of the Fifth Circuit that were decided prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

*United States v. Watkins*, 10 F.4th 1179, 1184–85 (11th Cir. 2021) (en banc) (citations and quotations omitted).

### III.     DISCUSSION AND ANALYSIS

In Defendants' amended notice of removal, they allege McDonald is a citizen of the state of Alabama.   *See* Doc. 14 ¶ 6, PageID.109-110.   Defendants also allege that Liberty Rent, a limited liability company, has only one member, Data Holdings, and thus shares Data Holdings' citizenships.   *See id.* ¶ 9, PageID.111; *Rolling Greens MHP*, 374 F.3d at 1022 ("[A] limited liability company is a citizen of any state of which a member of the company is a citizen."). McDonald does not dispute those allegations but does dispute that there is complete diversity among the parties, arguing that all of the defendants are Alabama citizens.

Defendants allege that Grimsley is "domiciled in and a citizen of Florida."   Doc. 14 ¶ 7, PageID.110.   McDonald, however, argues that Grimsley is domiciled in Alabama.   As for Data Holdings, it is undisputed that Data Holdings is a corporation, and for purposes of diversity jurisdiction "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business," subject to inapplicable exceptions.   28 U.S.C. § 1332(c)(1).   Defendants allege, and McDonald does not dispute, that Data Holdings is a citizen of North Carolina because it was "organized under the laws of" that state.   Doc. 14 ¶ 8, PageID.110.   As to its principal place of business, Defendants first argue that Data Holdings should not be deemed to have one because it "does not maintain a physical office, nor do its officers regularly conduct business in person. Instead, the majority of its executive functions are carried out virtually."   *Id.* (record citation omitted)).   Alternatively, Defendants argue that Data Holdings's principal place of business is in the state of Georgia because its "Chief Operating Officer and Chief Commercial Officer reside and work" there, "and the only in-person executive meetings in the past two years have been held"

there.   *Id.*, PageID.110-111.   McDonald, on the other hand, argues that Data Holdings does have a principal place of business, Alabama.

**A.**     **Grimsley's State of Domicile**

The law of this circuit is clear that a natural person's mere residence in a state does not establish that he or she is a citizen of that state for purposes of diversity jurisdiction.   *See, e.g.*, *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994) ("Citizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person.").   Rather, "[c]itizenship is equivalent to 'domicile' for purposes of diversity jurisdiction.   A person's domicile is the place of his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom."   *McCormick v. Aderholt*, 293 F.3d 1254, 1257-58 (11th Cir. 2002) (citations, internal quotation marks, and footnote omitted).   That is, "domicile requires both residence in a state **and** 'an intention to remain there indefinitely . . . .'" *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013) (emphasis added) (internal quotation marks omitted) (quoting *McCormick,* 293 F.3d at 1258); *see also Mas*, 489 F.2d at 1399 ("To be a citizen of a State within the meaning of section 1332, a natural person must be both a citizen of the United States and a domiciliary of that State.   For diversity purposes, citizenship means domicile; mere residence in the State is not sufficient.   A person's domicile is the place of his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom." (citations and internal quotation marks omitted)); *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1341–42 (11th Cir. 2011) ("For adults, domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there.   Domicile is not synonymous with residence; one may temporarily reside in one location yet retain domicile in a

previous residence.    Although physically present in the current residence, the person does not

intend to remain in that state indefinitely." (citations and internal quotation marks omitted)).

"Furthermore, a change of domicile requires '[a] concurrent showing of (1) physical presence at

the new location with (2) an intention to remain there indefinitely . . . .'" *McCormick*, 293 F.3d at

1258 (quoting *Mas*, 489 F.2d at 1399).

"Courts generally give little weight to a party's profession of domicile; they do so because

these declarations are often self-serving."    *Molinos Valle Del Cibao*, 633 F.3d at 1342.

> Words may be evidence of a man's intention to establish his domicile at a particular
> place of residence, but they cannot supply the fact of his domicile there.    In such
> circumstances, the actual fact of residence and a real intention of remaining there,
> as disclosed by his entire course of conduct, are the controlling factors in
> ascertaining his domicile.

*Stine v. Moore*, 213 F.2d 446, 448 (5th Cir. 1954).

In support of Defendants allegation that Grimsley is domiciled in Florida, they attached to

their notice of removal a declaration made by Grimsley under 28 U.S.C. § 1746, dated December

19, 2023, which states:

> I currently reside in and have resided in Escambia County, Florida since January
> 2023.    I have had an intention to remain in Escambia County, Florida indefinitely
> since that time.    As evidence of my intent, I am a registered voter in Escambia
> County, Florida. I have a Florida driver's license with a Pensacola, Florida address
> listed on it.    My vehicles have Florida liability insurance and are registered in
> Florida.    I have purchased two residential properties in Pensacola, Florida, and my
> payroll information reflects my Pensacola, Florida residency.

Doc. 14-2 ¶ 4, PageID.167.

Defendants have provided copies of Grimsley's driver's license and voter information card,

both of which were issued by the state of Florida—in March 2023, as McDonald admits—and

provide the same Pensacola address for Grimsley.    Doc. 14-3; Doc. 14-4; *see* Doc. 18,

PageID.181.    Defendants have also presented "Florida Automobile Insurance Identification

Cards" for Grimsley, effective May 8, 2023, that were mailed to the same Pensacola address as the one that is listed on both his driver's license and voter information card.   *See* Doc. 14-5.

In McDonald's motion to remand, he argues that Grimsley is actually domiciled at a Lillian, Alabama property he purchased on May 10, 2021.   *See* Doc. 18-1.   In support, McDonald cites the following evidence:

1. A January 1, 2022 mortgage note that was taken out by Grimsley on the Lillian property that states, in relevant part: "Borrower [Grimsley] shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be reasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control."   Doc. 18-2, PageID.202.

2. A complaint for divorce filed by Grimsley's then-wife against Grimsley on February 6, 2023, in the Circuit Court of Baldwin County, Alabama, and the wife's sworn written testimony submitted contemporaneously stating, in relevant part: "The Defendant [Grimsley] and I have both resided in Alabama for more than six (6) months immediately preceding the date the complaint for divorce in this action was filed. The Defendant and I were legally married to each other on June 23, 2018, and we lived together as husband and wife until on or about November 1, 2023, [4] at which time we were separated and since which time we have not lived together as husband and wife."   Doc. 18-3; Doc. 18-4, PageID.214.

---

[4] Since the written testimony is dated February 2, 2023, the undersigned assumes that "November 1, 2023" is a typo and should be November 1, 2022.

3.  The docket sheet of the divorce proceedings printed December 11, 2023, and an "Alabama Certificate of Divorce" entered by the circuit court clerk on May 1, 2023, both of which list Grimsley's address as the Lillian property.   Doc. 18-5; Doc. 18-6.

4.  Records from the Baldwin County Tax Assessor's Office showing that Grimsley owns the Lillian property and was assessed property taxes on it in 2023.   Doc. 18-7.

5.  An affidavit of the individual who served Grimsley with process for this action on October 25, 2023, at the Lillian property.   Per the affidavit, the process server knocked on the front door of the property "somewhere between 7:30 pm and 8:30 pm[,]" and "a young man who appeared to be in his teens opened the door."   The young man answered "Yeah" when asked if the address was "the Grimsley residence, and when he saw the server removing the complaint from his bag he exclaimed, "So, we're being served?"   The server answered, "Yes, this is for Mr. Grimsley."   The server saw Grimsley through the open door, sitting on a couch with a laptop computer in front of him.   Grimsley shouted for the server to give the papers to the young man, which he did, then left.   Doc. 18-8.

6.  An affidavit from an individual who observed and photographed Grimsley taking out the garbage at the Lillian property on December 19, 2023.   That individual observed and photographed the Lillian property again on December 26 and 27, 2023.   On both dates, the home appeared occupied and several vehicles were in the driveway.   Doc. 18-9.

7.  Evidence showing that the Pensacola, Florida address listed on Grimsley's Florida driver's license and voter information card is for a property owned by Peter and Katrina Mougey, the former of whom is a friend of Grimsley's and lawyer at a Pensacola law firm.   Docs. 18-10, 18-11; *see* Doc. 18-12; Doc. 18-13.

In response to the motion to remand, Defendants present a second § 1746 declaration from Grimsley, dated January 10, 2024.   Doc. 24-1. This declaration explains that, in the beginning of 2022, Grimsley lived with his then-wife in their "marital home" in Fairhope, Alabama.   *Id.* ¶ 3, PageID.294.   At that time, Grimsley's automobile and voter registrations were both in Baldwin County, and his Alabama driver's license and payroll information both reflected his Fairhope address.   *Id.*   In March 2022, Grimsley's teenage son was diagnosed with cancer, and Grimsley has "had to travel extensively for his treatment ever since."   *Id.* ¶ 4.   In October 2022, Grimsley and his wife separated, and he moved out of the Fairhope marital home, splitting his time between his Lillian property with his children and mother, and Pensacola, where he was alone.   *Id.* ¶ 5, PageID.294-295.   Grimsley admits that Peter Mougey is his "close friend," and that he resided at the Mougeys' Pensacola home as their guest "during this tumultuous time in lieu of renting an apartment."   *Id.*, PageID.295.

Grimsley claims that in January 2023 he "decided to establish a permanent domicile" in Pensacola, and accordingly changed his voter registration, driver's license, car registration, car insurance, and payroll information to reflect his residence at the Mougeys' home.   *Id.* ¶ 6, PageID.295.   On July 27, 2023, Grimsley purchased a plot of residential land in Pensacola, hired an architect to design a home for it, and had the completed plans approved by the city.   *Id.* ¶ 7. However, after obtaining full custody of his two sons on September 1, 2023, Grimsley determined he would need a larger home, so instead purchased a move-in-ready house at another Pensacola property on November 27, 2023.   *Id.* ¶¶ 8-9.

Grimsley explains that the Lillian property is a "vacation home" that "has always been a secondary residence as it [sic] remotely located in a rural area in Lillian" and "is not intended for long-term daily living."   *Id.* ¶ 10.   While Grimsley received mail related to his divorce

proceedings at the Lillian property, he "received the bulk of [his] mail in 2023" at the Mougeys' property where he was staying.   *Id.* ¶ 11, PageID.296.

McDonald also avers that Grimsley does most of his banking online but utilizes two bank branches in Florida "when in person transactions are needed."   Doc. 24-1 ¶ 12, PageID.296.  In McDonald's reply, he argues that Grimsley's use of these two bank branches is not evidence that he is domiciled in Florida because they are also convenient to Lillian, which is on the Alabama/Florida state line.   Given there is ample other evidence to support a finding that Grimsley is domiciled in Florida, the undersigned has assigned no evidentiary weight to where Grimsley does his banking.

It is undisputed that Grimsley owns the Lillian, Alabama property and resides there at times.   However, a natural person may temporarily reside at one location while still being domiciled in another.   *See Molinos Valle Del Cibao*, 633 F.3d at 1341-42.   What matters for showing domicile is an intention to remain at a particular residence indefinitely.   *Travaglio*, 735 F.3d at 1269.   "[J]urisdictional facts are evaluated as they stand at the time of removal[,]" and the undersigned finds that Grimsley has shown by a preponderance of the evidence that, when this case was removed on December 8, 2023, his state of domicile was Florida, not Alabama.   *Dudley v. Eli Lilly & Co.*, 778 F.3d 909, 913 (11th Cir. 2014); *accord, e.g.*, *Scimone*, 720 F.3d at 882 ("[Courts] assess jurisdictional facts at the time of removal.").

The evidence shows that, at least by January 2023, Grimsley began residing at the Mougeys' home in Pensacola, Florida, after moving out of his marital home in Fairhope in advance of his wife filing for divorce.   Thereafter, Grimsley took several actions indicating an intent to remain in Pensacola indefinitely.   By May 2023, Grimsley had changed his driver's license, voter registration, car insurance, and payroll information to all reflect that he resided in Pensacola.   In

July 2023, Grimsley purchased a plot of residential land in Pensacola and made plans to build a

house on it.    After scrapping those plans due to obtaining full custody of his sons in September

2023, Grimsley then purchased a move-in ready house in Pensacola around the time of removal.

In McDonald's reply, he disputes Grimsley's claim in his second declaration that he

purchased the move-in ready house on November 27, 2023, pointing out that the warranty deed

for the property was not executed until December 12, 2023, four days after removal.    *See* Doc.

29, PageID.356-357; Doc. 29-2.    However, even if Grimsley did not legally own the move-in

ready property until after removal, it can reasonably be assumed that he was at least in the process

of buying it at the time of removal, which still evidences an intent to continue residing in Pensacola

indefinitely.

McDonald's reply also claims that Grimsley's first declaration "is misleading at best and

false at worst because Grimsley could not have been living at the Mougey Property (as he

suggested by submitting his driver's license, voter identification card and insurance card bearing

that address) since he had already on November 27, 2023, almost three (3) weeks earlier, purchased

and began living in his 'move-in ready' Woodbine Property as he professed in his [second]

declaration."    Doc. 29 n.2, PageID.356.    The undersigned, however, does not find Grimsley's

failure to immediately update the address on his driver's license after moving into his new home

to be material, and regardless of where in Pensacola that Grimsley was living at the time of

removal, the preponderance of the evidence shows that Grimsley intended that the city of

Pensacola would be his place of domicile.

McDonald's evidence fails to rebut Grimsley's showing of domicile.    McDonald

highlights the fact that Grimsley's mortgage on the Lillian property states that it is to be used as

Grimsley's "principal residence," but the full provision states that Grimsley only must occupy it

as such "within 60 days after the execution of" the mortgage and "for at least one year after the date of occupancy . . . ."   Doc. 18-2, PageID.202.   As the mortgage was executed January 1, 2022, under those terms Grimsley was required to begin occupying the Lillian property as his primary residence no later than approximately March 1, 2022, and to continue occupying it as such until approximately March 1, 2023, at the latest—over eight months before removal.

The February 6, 2023 averments by Grimsley's ex-wife in initiating their divorce proceedings merely state that Grimsley and her "resided in Alabama for more than six (6) months immediately preceding the date the complaint for divorce" was filed, which has little bearing on whether Grimsley had intent to reside in Pensacola indefinitely by the time of removal in December 2023.   Grimsley admits he did not begin to reside in Pensacola until January 2023, and he did not go about changing his driver's license and voter registration to Florida until March 2023. The fact that Grimsley's Lillian address was used for his divorce proceedings adds little, if any, additional weight in the domicile analysis, especially since the Certificate of Divorce indicates that the divorce was uncontested and was finalized in late April 2023.   *See* Doc. 18-6.   Grimsley's occasional presence at the Lillian property in 2023, as documented by McDonald's evidence—once on October 25, the day Grimsley was served, and once on December 19, with the home also "appear[ing] occupied" by unidentified individuals "and several vehicles [observed] in the driveway" on December 26 and 27—is also insufficient to rebut the above-described evidence of Grimsley taking substantial steps to establish a Florida domicile.   Indeed, any extended occupancy of the Lillian property in the later part of December 2023, around the Christmas holidays, is consistent with Grimsley's description of the property as a "vacation home."

In McDonald's reply, he suggests that Grimsley's presence with his "school-aged son" at the Lillian house on the evening of October 25, 2023, is telling because it was "a school night."

Doc. 29, PageID.357.   Given that Lillian is only about a 30-minute drive from Pensacola, according to Google Maps, the undersigned declines to read too much into that fact.

McDonald argues that the Court should view Grimsley's second declaration with suspicion because he only submitted it in response to McDonald's motion to remand and did not include it with either his initial or amended notice of removal.   However, a notice of removal need only provide "a short and plain statement of the grounds for removal, "and a removing defendant is allowed to present additional jurisdictional evidence for the first time in opposition to a motion to remand.   28 U.S.C. § 1446(a); *Pletka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 772-74 (11th Cir. 2010).   Moreover, the Court's order directing Defendants to amend their notice of removal only required them to "allege the individual state of citizenship (i.e., domicile), not mere residence for the natural persons."   Doc. 8, PageID.93.   That order did not require Defendants to include additional evidence of domicile with the amended notice.

McDonald also argues the facts in this case are similar to those in *Woerner v. Killian Construction Co.*, Civ. Act. No. 1:17-cv-246-CG-B, 2018 U.S. Dist. LEXIS 38200, 2018 WL 1442897 (S.D. Ala. Mar. 6, 2018) (Bivins, M.J.), *report and recommendation adopted*, Civ. Act. No. 1:17-cv-246-CG-B, 2018 U.S. Dist. LEXIS 47219, 2018 WL 1440836 (S.D. Ala. Mar. 22, 2018) (Granade, J.), in which the Court found that the non-diverse natural person defendant, Mills, was domiciled in Alabama, rather than in Florida as he claimed, by the time the case was removed based on diversity of citizenship in June 2017.   In many ways, though, *Woerner* supports the conclusions reached here.   In *Woerner*, the evidence showed that, while Mills co-owned a Florida house with his former spouse, he had not resided there since the dissolution of the marriage in 2009 or 2010.   By 2015, Mills had bought a house in Foley, Alabama, was working and residing (with his fiancée and two children) full-time in Alabama and received his mail and filed income

taxes in Alabama.   While Mills did begin working on a new project in Panama City Beach, Florida in late 2016, and began leasing an apartment there in March 2017, the Court found that Mills did not exhibit "a fixed intent to remain in Florida indefinitely" because the work project was a temporary one slated for completion in 2019, his fiancée continued to reside (with the children) and work in Foley, Mills was "physically present" at the Foley home "three days a week[,]" and there were no plans to relocate the family to Florida.   Similarly, Grimsley began residing in Florida after the dissolution of his marriage in Alabama and was actively working to purchase a home in Pensacola for he and his two sons around the time of removal.   There is also no evidence that Grimsley is physically present at his Lillian residence for any amount of time approaching "three days a week."

Additionally, in *Woerner*, Mills maintained his Florida voting registration and Florida driver's license after moving to Alabama, and even "voted in the 2016 presidential election in Florida[,]" but the Court found those facts "of no moment" since "Mills had not resided at the address listed on his Florida voter registration card since 2009 or 2010 and had not actually resided in the State for at least two or three years."   2018 U.S. Dist. LEXIS 38200, at *9, 2018 WL 1442897, at *3. Here, on the other hand, Grimsley actively changed his driver's license, voter registration, and car insurance to Florida after moving from Alabama to Pensacola.

## B.    Data Holdings' Principal Place of Business

The Court need not address Defendants' argument that Data Holdings should not be deemed to have a principal place of business to decide the present motion.   However, even if Data Holdings must be shown to have a principal place of business, Defendants have sufficiently proven that it is in Georgia, not Alabama.

In support of Defendants' argument, they cite in both their amended notice of removal and

their response to the present motion, *P2ES Holdings, LLC v. Trinity Petroleum Management, LLC*, No. 4:22-CV-03002, 2023 U.S. Dist. LEXIS 23622 at *12-13, 2023 WL 1967949, at *3-4 (S.D. Tex. Feb. 13, 2023), *report and recommendation adopted*, Civ. Act. No. 4:22-CV-03002, 2023 U.S. Dist. LEXIS 36498, 2023 WL 2386885 (S.D. Tex. Mar. 6, 2023) (finding that a holding company did not have "a principal place of business" where it was controlled by a board of directors consisting of members in various locales who met virtually, and "no evidence [was] presented . . . indicating that [the company]'s board of directors makes any decisions at any particular locale").   Both in McDonald's motion to remand and his reply in support, he largely fails to engage with this case law.

To be fair, Defendants' perfunctory citation to a single, non-binding district court case fails to sufficiently grapple with the underlying complexity of the legal issue presented.   *See, e.g., Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) ("A district court is not bound by another district court's decision, or even an opinion by another judge of the same district court . . . .").   The Eleventh Circuit Court of Appeals has "join[ed] the Third Circuit in holding a dissolved corporation has no principal place of business." *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1070 (2012) (agreeing with *Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995)).   However, Defendants do not claim, and the record does not support a determination, that Data Holdings is dissolved or inactive.   Moreover, none of the cases cited in *P2ES Holdings* support a categorical proposition that any corporation whose officers conduct business virtually from different locations cannot be found to have a principal place of business.

In *3123 SMB LLC v. Horn*, for instance, the Ninth Circuit held "that a recently-formed holding company's principal place of business is the place where it has its board meetings, regardless of whether such meetings have already occurred, unless evidence shows that the

corporation is directed from elsewhere."   880 F.3d 461, 468 (2018).   The panel majority then

went on to find that the subject corporation's principal place of business was Clayton, Missouri,

because its registered office was there, there was "no evidence that its bylaws prescribe that the

annual meetings be held elsewhere, and [there was] uncontradicted testimony that they are in fact

held in Clayton."   *Id.* at 470.   And in *Johnson v. SmithKline Beecham Corp.*, the Third Circuit

affirmed the district court's finding that a holding company's principal place of business was in

Wilmington, Delaware, noting that "[f]or a holding company [engaged in limited business

activities], relatively short, quarterly board meetings may well be all that is required to direct and

control the company's limited work."   724 F.3d 337, 354 (2013).

> As to what constitutes a "principal place of business," the Supreme Court has held:
>
> That "principal place of business" [as used in § 1332(c)(1)] is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities.   It is the place that Courts of Appeals have called the corporation's "nerve center."   And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, i.e., the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).   Importantly, a corporation's "nerve center"

"is a single place[,]" and it is "a place *within* a State.   It is not the State itself."   *Id.*   Thus, it is

improper for a court to apply a "general business activities test [that] look[s], not at a particular

place within a State, but . . . at the State itself, measuring the total amount of business activities

that the corporation conducts there and determining whether they are significantly larger than in

the next-ranking State."   *Id.* (citation and internal quotation marks omitted).

In Grimsley's December 19, 2023 declaration that is attached to the amended notice of

removal, he avers the following in support of Defendants' contention that Data Holdings's

principal place of business is in Atlanta, Georgia:

1.  Grimsley is the Chief Executive Officer of Data Holdings.    The company used to lease a principal office at 7530 Parker Road in Fairhope, Alabama, but the company ceased using it during the COVID-19 pandemic, and the lease was not renewed after expiring at the end of January 2021.    Doc. 14-2 ¶ 7, PageID.168.

2.  In the third quarter of 2022, Grimsley hired a consultant from Atlanta to act as interim CEO of Data Holdings while Grimsley took an indefinite leave of absence to attend to his son's cancer treatment.    That consultant reconstituted the company's leadership team, and rented office space in Atlanta, from which the leadership team operated until the consultant left the company shortly thereafter.    *Id.* ¶¶ 8-11.

3.  Grimsley, Chief Operating Officer Chris Spangler, and Chief Commercial Officer Dove LeBaron "are the officers for Data Holdings, Inc. that make the majority of the decisions directing, controlling, and coordinating Data Holdings, Inc.'s activities."    Spangler and LeBaron both reside in Georgia and conduct the majority of their business on behalf of Data Holdings from their residences in Atlanta and Marietta, respectively.    *Id.* ¶¶ 12-14, PageID.168-169.

4.  As of October 24, 2023, when this case was initiated, Data Holdings has no physical office. The majority of its executive meetings are conducted virtually, and any in-person executive meetings have been conducted in and around Atlanta, Georgia.    *Id.* ¶ 15, PageID.169.

In the § 1746 declarations that are both dated January 10, 2024, and attached to the Defendants' response to the present motion, Spangler and LeBaron each confirm that, "[s]ince the first quarter of 2023," Grimsley, Spangler, and LeBaron "are the executive team that makes the operational decisions for . . . Data Holdings."    Doc. 24-2 ¶ 4, PageID.309; Doc. 24-3 ¶ 4,

PageID.313.   Spangler and LeBaron also provide the following additional information that is relevant to determine Data Holdings' "nerve center:"

1. Data Holdings is a holding company with a Board of Directors that maintains oversight over the executive team.   The Board is comprised of Grimsley and two other individuals, one of whom resides in Louisiana, and the other in Ireland.   The Board holds quarterly meetings.   The last in-person meeting was held in Atlanta in December 2022.   Since then, all quarterly board meetings have been held virtually.   Doc. 24-2 ¶ 5, PageID.309-310.

2. As Chief Operations Officer for Data Holdings, Spangler is "the executive responsible for directing the day-to-day operations of the business and [is] directly involved in almost all of the companies' executive decision-making."   Spangler conducts the majority of his business from his residence in Atlanta, Georgia.   *Id.* ¶¶ 6-7, PageID.310.

3. As Chief Commercial Officer for Data Holdings, LeBaron is "the executive responsible for revenue generation[, who] direct[s] and control[s] the companies' marketing, sales, customer support, account management, and claims department."   LeBaron conducts "the majority of [her] business" from her residence in Marietta, Georgia.   Doc. 24-3 ¶ 5-6.

4. Data Holdings does not have a physical office, and the "vast majority" of its operations and executive decisions are carried out virtually, with Spangler and LeBaron participating from their respective residences in Atlanta and Marietta.   However, the "vast majority" of in-person executive meetings in 2023 were held in Atlanta, Georgia.   Specifically, the executive team held in-person business meetings at a Springhill Suites in Atlanta, Georgia, April 3-4, April 25-27, and May 15-17, 2023, and assembled in-person at a residence in Jasper, Georgia, on April 26, 2023.   Additionally, LeBaron and Spangler attended the

Atlanta Sales Summit on February 20-22, 2023.   No in-person executive or board meetings were held in Alabama in 2023.   Doc. 24-2 ¶¶ 8-9, PageID.310; Doc. 24-3 ¶¶ 8-9, PageID.313.

In support of McDonald's contention that the corporation's principal place of business is in Alabama, he cites a "Business Corporation Annual Report" for Data Holdings filed by Grimsley with the North Carolina Secretary of State on April 5, 2023, which lists the Parker Road address in Fairhope as both the "Principal Office Street Address" and the "Principal Office Mailing Address" for Data Holdings.   Doc. 18-14, PageID.259. Grimsley is also the sole "Officer" for Data Holdings listed on the annual report and provides the same Parker Road address as his own. *Id.*   However, as Defendants correctly point out, the Supreme Court has held that a corporation merely providing the address of a "principal office" or the like on a government form filing does not, by itself, prove the location of the corporation's "nerve center."   *See Hertz Corp.*, 559 U.S. at 96–97 ("When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof.   And when faced with such a challenge, we reject suggestions such as, for example, the one made by petitioner that the mere filing of a form like the Securities and Exchange Commission's Form 10–K listing a corporation's 'principal executive offices' would, without more, be sufficient proof to establish a corporation's 'nerve center.'" (citations omitted)).   Moreover, the form itself was filed eight months prior to the date of removal, further diminishing any evidentiary value it may have.

McDonald also presents evidence of a property located on Greeno Road in Fairhope, which county tax records indicate is owned by Liberty Rent.   *See* Doc. 18-15.   In an affidavit that is attached to his motion to remand, McDonald claims that the Greeno Road property was "the principal place of business for Liberty Rent and Data Holdings" "[d]uring the entire time that [he]

was employed by Liberty Rent . . . ."   Doc. 18-13 ¶ 2, PageID.257.   Grimsley referred to the building at that property "as 'The Bunker,' and all in-person executive meetings occurred [t]here." *Id.* ¶ 3.   McDonald asserts that "the Bunker served as the 'nerve-center' for Data Holdings and Liberty Rent (particularly Liberty Rent) out of which Mr. Grimsley and [McDonald] directed, controlled and coordinated Liberty Rent's activities."   *Id.* ¶ 4, PageID.258.

However, as Defendants correctly point out, McDonald's declaration is limited to information from his time when he was employed with Liberty Rent, which ended in March 2022, almost two years before this case was removed.   Moreover, even McDonald's declaration hedges on how much of the information he provides is relevant to Data Holdings, as he admits "the Bunker" served as the "nerve center" for Liberty Rent "particularly[,]" and that he and Grimsley "controlled and coordinated **Liberty Rent's** activities" from there.   *Id.* (emphasis added). Because Liberty Rent's citizenship is determined solely by that of its member Data Holdings, *see Rolling Greens MHP*, 374 F.3d at 1022, only evidence regarding Data Holdings is relevant to determining its "nerve center."   *Cf. Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 62–63 (1st Cir. 1993) ("[I]n determining a corporation's principal place of business, a district court's inquiry must focus *solely* on the business activities of the corporation whose principal place of business is at issue[, except] where there is evidence that the separate corporate identities of a parent and subsidiary have been ignored."); *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 351 (3d Cir. 2013) ("The argument that we must look to GSK LLC's activities to identify GSK Holdings' nerve center . . . ignores the well-established rule that a parent corporation maintains separate citizenship from a subsidiary unless it has exerted such an overwhelming level of control over the subsidiary that the two companies do not retain separate corporate identities.").[5]

---

[5] In fairness, Defendants have also relied to some degree on evidence of Liberty Rent's business

In his second declaration that is attached to his response to the present motion, Grimsley avers that the Greeno Road property is owned by "unrelated limited liability company" MudFish, LLC.   Doc. 24-1 ¶ 15, PageID.296-297.   Grimsley admits that the Greeno Road property "was occasionally used for company meetings and events[,]" but that the last meeting ever held there was with McDonald when he left the company in March 2022.   *Id.*, PageID.297.   The property has since "been relegated to a storage facility."   *Id.*   Spangler's declaration affirms that the Greeno Road property has been used as a storage facility for all of 2023, that none of Data Holdings's officers or employees report to work there, and that none of the company's "operational or executive decisions have been carried out at that property in 2023."   Doc. 24-2 ¶ 11, PageID.311.   For her part, LeBaron states that she has never conducted business at the Greeno Road property.   Doc. 24-3 ¶ 10, PageID.313.

All told, Defendants have shown by a preponderance of the evidence—i.e., that it is more likely than not—that Data Holdings's principal place of business at the time of removal was Atlanta, Georgia.   At the very least, they have shown it is more likely than not that the principal place of business was <u>not</u> in Alabama at the time of removal, which is all that is required for Data Holdings, and by extension Liberty Rent, to show that they are of diverse citizenship from McDonald.   The undisputed evidence shows that, of the three corporate officers who make up Data Holdings's executive team, two reside in or near Atlanta, including the officer "responsible for directing the day-to-day operations of the business."   Doc. 24-2 ¶¶ 6-7, PageID.310.   Both conduct most of their work remotely from their residences, all in-person executive meetings in 2023 were held in or around Atlanta, and the last in-person meeting of Data Holdings's Board of Directors took place in Atlanta.   The third corporate officer, Grimsley, is domiciled in Florida, as

---

activities in support of their positions regarding Data Holdings's "nerve center."

explained above.   Data Holdings' leadership team even operated out of rented space in Atlanta for a time in or after the "third quarter of 2022," until its operations went fully remote after the departure of its interim CEO.   In the face of this evidence, McDonald has presented only an address on a government form—which the Supreme Court has said is not dispositive—and stale information about Data Holdings's operations from in or before March 2022, almost two years before removal of this case.[6]

In sum, the Defendants have shown by a preponderance of the evidence that there is complete diversity among the parties that allows the Court to exercise of subject-matter jurisdiction, pursuant to § 1332(a), over this case.   McDonald does not dispute that § 1332(a)'s requisite minimum amount in controversy is satisfied, and the undersigned finds no reason to question it *sua sponte* at present.

### IV.   CONCLUSION

Accordingly, the Motion to Remand (Doc. 18) is **DENIED**.

**DONE** and **ORDERED** this 24th day of July 2024.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE

---

[6] Admittedly, the present motion to remand was brought without the benefit of the parties' engaging in any discovery.   Should discovery reveal new pertinent information bearing on the Defendants' citizenships, McDonald may bring that information to the Court's attention before final judgment through another motion to remand.   *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); FED. R. CIV. P. 54(b) (in general, "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities").